# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**VERONICA I. LITTLEFIELD,**

     **Plaintiff,**

v.

     **Civil Action No. 5:07cv110**
     **The Honorable Frederick P. Stamp**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

     **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

     This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. PROCEDURAL HISTORY

     Veronica I. Littlefield ("Plaintiff") filed an application for DIB on August 17, 2004, alleging disability since October 1, 2003, due to asthma, colitis, migraines, severe eczema, depression, hypoglycemia, and back problems (R. 56-59, 73). Plaintiff's applications were denied at the initial and reconsideration levels (R. 42-44, 48-50). Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on May 22, 2006 (R. 295). Plaintiff, represented by counsel, Matt Berry, testified on her own behalf (R. 295-322). Also testifying was Vocational Expert Larry Bell ("VE") (R. 322-25). On July 3, 2006, the ALJ entered a decision finding Plaintiff

FILED

OCT 15 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

was not disabled as she could perform a wide range of light physical activity (R. 26, 28). Plaintiff timely filed a request for review to the Appeals Council (R. 13-14). On June 27, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-7).

## II. FACTS

Plaintiff was born on December 30, 1963, and was forty-four years old at the time of the administrative hearing (R. 299). She has a high-school education and completed bookkeeping course work (R. 299). She has past relevant work as an accounting/payroll clerk, a store clerk, an officer manager, and an operator of a cleaning business (R. 302-08).

On December 16, 2002, Plaintiff presented to Belington Clinic with complaints of coughing and wheezing. Plaintiff reported her asthma had worsened since August and that she had not taken Singulair "for several months." Plaintiff was diagnosed with asthma and prescribed Singulair (R. 246).

On March 31, 2003, Plaintiff presented to Belington Clinic for treatment of depression. She stated she could not "deal [with] crowds," she panicked in them, and she avoided them. She was "very angry" and having "'mean ideas." Plaintiff was diagnosed with asthma and depression. Plaintiff was prescribed Wellbutrin (R. 245-46).

On April 23, 2003, Plaintiff had a follow-up appointment at Belington Clinic for depression. She reported she still experienced mood swings and anger while talking Wellbutrin. The medical professional told Plaintiff she "need[ed] to wait" to realize improvement from the medication (R. 245).

On October 15, 2003, Plaintiff reported Zoloft caused mild nausea, but that it was working

2

well and her moods were good. Plaintiff treated her asthma with an inhaler and neblulizer at "least twice daily." Plaintiff was diagnosed with asthma and depression. She was prescribed Zoloft and Advair (R. 244).

On March 4, 2004, Plaintiff reported to the medical professional at Belington Clinic of having cough and wheezing (R. 244). Plaintiff was diagnosed with asthmatic bronchitis (R. 243).

On March 24, 2004, Plaintiff presented to Belington Clinic with complaints of coughing up blood. She reported her cough was worse in the morning and that she was experiencing chills. Plaintiff was diagnosed with asthmatic bronchitis. She was prescribed Advair (R. 243).

On September 23, 2004, Plaintiff had an annual physical at Belington Clinic. Her skin had large, dry patches on it; her lungs were clear (R. 242).

On September 30, 2004, Plaintiff presented to the Belington Clinic. She reported feeling well. She stated Advair helped her wheezing. Plaintiff had eczema on the T-zone of her face. She was diagnosed with asthma and eczema. She was prescribed Advair and Elidel.

On October 6 and December 6, 2004, Plaintiff received chiropractic care for her upper and lower back and neck (R. 218).

On October 29, 2004, Plaintiff was give a routine check up at Belington Clinic. Plaintiff's blood pressure was elevated to 142/80. She was diagnosed with mild hypertension. She was prescribed Alterolol and instructed to reduce all caffeine(R. 240).

Kip Beard, M.D., completed an Internal Medicine Examination of Plaintiff on November 14, 2004. Plaintiff listed her conditions as hyperglycemia, asthma, chronic back pain, headaches, and colitis. Plaintiff reported to Dr. Beard that she had experienced low back pain since she was in her 20's when she injured her back lifting. Plaintiff described her pain as sharp, radiating to her right

buttock. Plaintiff stated she experienced numbness in her entire right leg and foot if she sat for too long a time. Plaintiff informed Dr. Beard that she had a "'center spot in the back and neck that [gave] out." She was being treated by a chiropractor for her back condition. Plaintiff stated she had not undergone a MRI or x-rays for her back; she had not undergone surgery or injections. Plaintiff occasionally wore a back brace (R. 199).

Plaintiff stated she had had asthma for fourteen years. She coughed regularly; she wheezed "'some.'" Plaintiff stated she did not smoke and had last been treated in an emergency room for her asthma symptoms in 1998. Plaintiff reported using an Albuterol nebulizer twice weekly. She used the albuterol nebulizer more frequently in the winter months – four times daily. Plaintiff stated the meter-dosed inhaler did not "help her very much." She stated dust, cold, and humid conditions exacerbated her asthma symptoms (R. 199).

Plaintiff reported having had hypoglycemia since she was sixteen years old. Plaintiff's symptoms were episodes of nausea, vomiting, dizziness, headache, and inability to concentrate. Plaintiff stated she had never been hospitalized for hypoglycemia and she had never been given a diagnosis as to why her blood sugar "drops." Additionally, Plaintiff reported to Dr. Beard that she experienced headaches once or twice per week, each lasting three to four hours. Her headache-related symptoms included nausea, photophobia and phonophobia (R. 200).

Plaintiff described her colitis as her having had a "'nervous stomach for years.'" Plaintiff began "'passing blood'" in 2000 but had not undergone an endoscopy because she had been "fired from her job and lost her insurance." Plaintiff reported her symptoms as diarrhea, nausea, feeling of warmness, head rush, and dizziness, which "'hardly [happened] at all" after Plaintiff modified her diet (R. 200).

Plaintiff listed her medications as Singulair, Atenolol, Zoloft, Metronidazole, Elidel, Tramcinolone, Albuterol. Plaintiff listed depression as "other illness." Plaintiff stated she did not smoke and rarely consumed alcohol. Plaintiff listed Dr. Spotlowe as her primary care physician (R. 200).

Upon examination, Dr. Beard noted Plaintiff was five-feet, three-inches tall and weighed 227 pounds. Plaintiff ambulated normally and stood unassisted. Plaintiff did not have difficulty arising from a seated position or stepping up and down from the examination table. When seated, Plaintiff was mildly uncomfortable; she experienced back pain in the supine position (R. 201). Plaintiff's HEENT, neck, chest, cardiovascular, abdomen, cervical spine, arms, hands, knees, ankles, feet, and neurologic examinations produced normal results (R. 201-02). Plaintiff's extremities were normal, except for "psoriatic appearing plaques which [were] nonpustular on the extensor surfaces of the elbows and knees, also in the low back and trunk" (R. 201). Examination of Plaintiff's lumbar spine and hips showed pain on motion testing and tenderness without spasms. Plaintiff was able to stand on either leg. Her seated straight leg raising test was for ninety degrees. She had no complaints of pain during this test. Plaintiff's supine straight leg raising test was for seventy degrees, with complaints of back pain on either side. Plaintiff's hips were without tenderness or pain (R. 202).

Dr. Beard considered the x-ray report of Plaintiff's lumbar spine, taken on November 10, 2004. It showed marked narrowing of L5-S1. Dr. Beard considered the November 10, 2004, x-ray made of Plaintiff's chest, which was normal (R. 206).

Dr. Beard considered the results from pulmonary function test which Plaintiff underwent on November 10, 2004. It showed good effort by Plaintiff. Plaintiff's best post-medicine FVC was 1.96 and best post-medicine FEV1 at 1.41. Plaintiff was diagnosed with mild COPD with moderate

restrictive disease with no improvement noted after bronchodilation (R. 207). The examination report read that there was no evidence of bronchospasm and no acute respiratory illness present (R. 209).

Dr. Beard's impression was for hypoglycemia, by history; asthma; chronic musculoskeletal low back pain; headaches, possibly migraines; possible irritable bowel syndrome; and psoriasis (R. 202). Dr. Beard opined Plaintiff's pulmonary functions revealed "mild COPD, moderate to restriction" and "some motion loss with pain and tenderness" due to chronic back pain. Plaintiff's straight leg raising test was negative and her neurologic examination was negative for radiculopathy. Dr. Beard found Plaintiff's colitis "may represent actually irritable bowel syndrome." He noted Plaintiff had "no appreciable psoriatic arthritis" (R. 203).

On November 18, 2004, Thomas Stein, Ed.D., completed a Mental Status Examination of Plaintiff. Plaintiff communicated her chief complaint as follows: "Physically, it's my asthma and my migraines because I have frequent asthma attacks where I can't hardly breathe, can't do anything strenuous like climb stairs. When I leave a warm house and go into cold temperatures outside then I immediately have an asthma attack. My migraines come on a daily basis and start at my right eye and proceed around the right side of my head. They last about four or five hours but the worse ones last all day long. Emotionally, I do poor with crowds and groups of people and try to avoid them if possible. I can't deal with stress. I either get angry at others or have a crying spell and then withdraw. Also, I have PTSD from bad things that happened to me earlier in my life" (R 211-12). Mr. Stein noted Plaintiff was cooperative, polite, and subdued during her examination. Her posture and gait were "adequate" (R. 211). Plaintiff lived with her husband and son and had "zero" income (R. 212).

6

Mr. Stein noted Plaintiff's presenting symptoms were sleep disturbances, such as falling asleep, frequent awakening, and nightmares. Plaintiff reported crying once per week, having poor energy levels, having "'tempermental'" mood, having suicidal ideations with one suicide attempt at aged sixteen, being phobic about bee stings, experiencing two or three panic attacks during the previous year, being compulsive about cleanliness and orderliness, being severely abused as a child, witnessing her brother being shot with a gun, being raped three times as a teen, having an inability to trust "any man," and have intrusive thoughts about her previous experiences. Mr. Stein reviewed Plaintiff's typewritten correspondence with DDS relative to her depression (R. 212).

Plaintiff reported she did not use tobacco products. Plaintiff reported she drank two or three six-packs of beer or a fifth of alcohol over a two-day period when she was in her late teens and early twenties for a five-year period. Plaintiff reported currently drinking one drink per month. Plaintiff denied having used "illicit drugs" since she was eighteen years of age (R. 212).

Plaintiff informed Mr. Stein she had been treated for depression from March 2003 to present by her primary care physician, who prescribed psychoactive medications. Plaintiff stated she had never been treated by a psychologist or psychiatrist (R. 213).

Plaintiff's speech was relevant, coherent, and normal paced; she was oriented times four; her mood was depressed and anxious; her affect was "mostly" subdued with "some tearfulness"; her thought process was normal; she evidenced "mild paranoid delusional thinking"; her perception was normal; her insight was adequate; her judgment was average; she had no current suicidal ideations; Plaintiff's immediate memory was mildly deficient; her recent and remote memories were moderately deficient; and Plaintiff's concentration was poor (R. 214)

Plaintiff reported her subjective symptoms as follows: chronic asthma, chronic migraine

headaches, chronic posttraumatic stress symptoms, fear, avoidance of crowds (R. 214-15). Mr. Stein listed Plaintiff's objective symptoms as follows: cooperative, polite, subdued, depressed, anxious, fair memory and concentration, average judgment, average insight, and average intelligence. Mr. Stein made the following diagnoses: Axis I – posttraumatic stress disorder, recurrent type; panic disorder with agoraphobia; obsessive-compulsive disorder; and dysthymia; Axis II – no diagnosis; Axis III – asthma, hypoglycemia, migraines, colitis, chronic back pain, and hypertension. Mr. Stein listed Plaintiff's prognosis as fair (R. 215).

Plaintiff listed the following activities of daily living: arose at 6:30; cared for her personal hygiene; swept entire floor; fixed coffee; checked wood stove; fed pets; prepared spouse's lunch for work; checked e-mails on computer; showered; fixed and ate breakfast; got dressed; cleaned the kitchen; swept all floors again; did dishes; "search[ed] the house for any household work that need[ed] to be done"; snacked at about 2:00 p.m.; took breathing treatment; used sun lamp for eczema; "play[ed] on computer"; took short nap; visited with spouse when he came home from work; prepared dinner; ate dinner at 8:30 p.m.; cleaned kitchen; did "more work on the computer"; checked on her dogs; swept the floor; retried to bed at 10:00 p.m. Plaintiff did the laundry, occasionally grocery shopped, occasionally ran errands, occasionally walked, drove regularly, went to post office, read, hunted and fished (R. 215).

Plaintiff's social functioning included: regularly attended church, got along well with spouse, attended church meetings, occasionally ate in restaurant with spouse, occasionally visited with friends and relatives, occasionally socialized with friends and neighbors (R. 215).

Mr. Stein found Plaintiff's concentration was moderately deficient, her persistence was normal, and her pace was normal. Mr. Stein found Plaintiff was capable of managing her financial affairs (R. 216).

On November 29, 2004, Plaintiff reported to Belington Clinic with complaints of shortness of breath and headaches twice weekly. Plaintiff was diagnosed with asthma, depression, and migraine headaches. She was prescribed Aterolol, Albuterol and Advair (R. 239).

On December 3, 2004, Kristine J. Lilly, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. She found Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 121). Dr. Lilly found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff could never climb ladders, ropes, and scaffolds (R. 122). Dr. Lilly found Plaintiff had no manipulative, visual, or communicative limitations (R. 123-24). Dr. Lilly found Plaintiff's exposure to noise was unlimited and that she should avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 124). Dr. Lilly found Plaintiff "appear[ed] to be credible." He noted she had a documented history of asthma and was compliant with her medications (R. 125).

On December 20, 2004, Robert Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff. Mr. Marinelli found Plaintiff had affective and anxiety-related disorders (R. 220). Plaintiff's affective disorder was dysthymia; her anxiety-related disorder was PTSD, OCD, panic disorder with agoraphobia (R. 223, 225). Mr. Marinelli found Plaintiff had a mild degree of limitation in her activities of daily living and her ability to maintain social functioning. Mr. Marinelli found Plaintiff's ability to maintain concentration, persistence, or pace was moderately limited. Mr. Marinelli found Plaintiff had experienced no episodes of decompensation (R. 230).

9

Also on December 20, 2004, Mr. Marinelli completed a Mental Residual Functional Capacity Assessment of Plaintiff. Mr. Marinelli found Plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions and was moderately limited in her ability to remember locations and work-like procedures and understand and remember detained instructions. Mr. Marinelli found Plaintiff was not significantly limited in the following abilities: carry out very short and simple instruction; sustain an ordinary routine without special supervision; and make simple work-related decision (R. 234). Mr. Marinelli found Plaintiff was moderately limited in the following abilities: carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 234-35). Mr. Marinelli found Plaintiff presented no evidence of any limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and ability to work in coordination with or proximity to others without being distracted by them (R. 234). Mr. Marinelli found Plaintiff was not significantly limited in her abilities to interact appropriately with general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Mr. Marinelli found Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Mr. Marinelli found Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting; not significantly limited in her abilities to be aware of normal hazards, take appropriate precautions and travel in unfamiliar places or use public

10

transportation; and not limited in her ability to set realistic goals or make plans independently of others (R. 235). Mr. Marinelli opined Plaintiff's mental residual functional capacity was "consistent with . . . competitive employment involving short & simple instructions with low interpersonal demands" (R. 236).

On January 19, 2005, Plaintiff was seen at Belington Clinic. She reported she usually had a headache each day; her breathing was fair; she experienced increased sensitivity to chemicals, which caused wheezing; and her inhaler was not "working" well. "Large areas eczema" were noted on Plaintiff's arms, face, and ears. Plaintiff was diagnosed with asthma and eczema and prescribed Zoloft, Singulair, and Advair. Plaintiff was told to return for a follow-up examination in three to four months (R. 238).

On June 1, 2005, a state-agency physician completed a Physical Residual Functional Capacity assessment of Plaintiff. The state-agency physician found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in and eight-hour workday, and push/pull unlimited (R. 254). Plaintiff could occasionally climb ramps and stairs, but she could never climb ladders, ropes, or scaffolds. Plaintiff could frequently balance, stoop, kneel, crouch, or crawl (R. 255). Plaintiff has no manipulative, visual or communicative limitations (R. 256-57). Plaintiff's limitations were unlimited relative to her exposure to wetness, noise, and vibration. Plaintiff should avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 257).

On June 13, 2005, Joseph Kuzian, Ed.D., reviewed and affirmed the opinions expressed by Mr. Marinelli's December 20, 2004, Psychiatric Review Technique and Mental Residual Functional Capacity Assessment (R. 220, 236).

On July 7, 2005, Plaintiff presented to Caren Thompson, D.O., with complaints of a sore throat, ear pain, and cough. Dr. Thompson's examination of Plaintiff's skin, HEENT, neck, cardiovascular and lungs showed normal results. Plaintiff's general examination was normal, in that it showed Plaintiff's weight was stable, she had no fatigue, and she was afrebril. Plaintiff's psychological exam showed she was pleasant, cooperative, and insightful. Dr. Thompson diagnosed osteoarthritis of Plaintiff's lumbar spine, osteoarthritis at C3-4 and C6-7, and herniation at C4-5 and C5-6. Plaintiff was prescribed a Z-pak and Hycotuss (R. 265).

On July 14, 2005, Plaintiff presented to Kristin Barberio, PA-C, of Franz Dermatology and Associates, Inc., for complaints of psoriasis. P.A. Barberio corresponded with Dr. Thompson, who had referred Plaintiff for treatment. P.A. Barberio opined Plaintiff had "multiple plaques of erythema without scaling"; "mild scaling on her forehead and scalp." Plaintiff informed P.A. Barberio she experienced "some joint pain in her hands and feet." Plaintiff was prescribed Dovonex, Clobetasol, and Cormax. P.A. Barberio ordered a complete lab profile; Plaintiff was instructed to return in one or two months for follow-up care (R. 267).

On August 25, 2005, Dr. Thompson treated Plaintiff for fatigue. Plaintiff complained fo weakness and dizziness. It was noted that Plaintiff's sleep was good; her general physical examination showed she was stable, had no fatigue, was afrebrile, and was within normal limits. Dr. Thompson's examination of Plaintiff's skin, cardiovascular system, lungs, and extremities showed results that were within normal limits. Dr. Thompson found Plaintiff's psychological examination was normal. Dr. Thompson diagnosed fatigue, weakness, depression, and hypertension, and hyperlipidemia. She prescribed Risinopril and Zoloft (R. 264).

On November 16, 2005, Plaintiff presented to Dr. Thompson for treatment of cold

symptoms. Plaintiff complained of cough and sore throat. The results of Dr. Thompson's examinations of Plaintiff's HEENT, neck, cardiovascular system, and lungs were within normal limits. Plaintiff's general physical condition was stable; she was not fatigued; she was afebrile. Dr. Thompson assessed mid-epigastric pain and osteoarthritis of cervical, lumbar, and sacral spine. She prescribed Prevacid, Robitussin, and hydrocodone (R. 263).

On April 24, 2006, Plaintiff presented to Dr. Thompson for a three-month follow-up examination. Plaintiff informed Dr. Thompson she had a sleep study scheduled for May 5, 2006, and an appointment with Dr. Jackson for treatment of psoriasis. The results of Dr. Thompson's examinations of Plaintiff's neck, cardiovascular, lungs, psychological, and extremities were within normal limits. She found Plaintiff was stable. Dr. Thompson found Plaintiff had "open . . . areas b/l elbows . . . ." She diagnosed sleep apnea and psoriasis (R. 262).

On April 26, 2006, Dr. Franz removed a dermatofibroma from Plaintiff's right posterior arm (R. 266).

Administrative Hearing

On May 22, 2006, the ALJ conducted an administrative hearing. The ALJ asked Plaintiff's counsel if he "had an opportunity to look over the exhibits in the file in this case." Plaintiff's counsel responded that he and Plaintiff did not as "[t]he file was to be transmitted to Atlanta for copying, I don't think it ever made it, but I have submitted the exhibit list and I'm . . . content with my preparation and going forward." The ALJ then advised Plaintiff and Plaintiff's counsel that she would admit the exhibits that were contained in the file. She informed Plaintiff and Plaintiff's counsel that if "any objections . . . [came] up once [they] peruse[d] the file, [they] [could] always let [her] know about that" (R. 298).

Plaintiff testified she listed her onset date as October 1, 2003, because that was "when [her] psoriasis was particularly bad" and when her "asthma [had] been progressively getting worse" (R. 301). Plaintiff described her psoriasis as itchy and flaky, appearing and feeling like a third degree burn, or "very deep paper cut[s] that never heal" (R. 308). Plaintiff testified she had discussed treatment of her psoriasis by injectable Enbrel with her "general practitioner" (R. 309). Plaintiff stated she treated her asthma with Albuterol, Advair, and Singulair. Plaintiff testified she had a herniated disk in her lower lumbar spine and a partial herniated disk in her neck. She treated her back pain with pain killers as her "general practitioner believe[d] that's the way to go for now" (R. 310). Plaintiff stated she experienced migraine headaches, which are triggered by asthma or neck pain. Plaintiff testified she experienced psoriatic arthritis. She stated she could "talk to [her] doctor to see who she would recommend" to treat her for psoriatic arthritis, but that the hydrocodone she takes for her back pain "helps take the edge off the arthritis pain." Plaintiff stated she was treated by her general practitioner for depression. She is prescribed Zoloft and did not attend counseling (R. 311).

Plaintiff testified she had "been seeing Dr. Frans [sic], . . . actually his partner, Dr. Jackson." Plaintiff had last visited Dr. Jackson the month before, April, and was "usually" scheduled to see them "every three months or so." Plaintiff stated Drs. Franz and Jackson were dermatologists. Plaintiff testified she saw Dr. Pondo, a pulmonologist "about every three months or so as needed" (R. 314). Plaintiff stated "[t]he one [doctor she] [saw] on a regular basis [was her] general practitioner," Caren Thompson (R. 314-15). Plaintiff stated she was scheduled to be treated by both Dr. Thompson and Dr. Pondo during the next month, June (R. 315).

14

On March 23, 2007, Plaintiff, through counsel, submitted evidence to the Appeals Council and requested remand to the ALJ because "both [Plaintiff's] . . . attorney and the ALJ clearly failed to develop this record." Plaintiff asserted that there were "multiple treating physicians in this case whose reports were not obtained. Each of these physicians was reported by [Plaintiff] throughout the record in disability reports" (R. 269). The reports submitted were as follows:

1. Record of an emergency room visit for asthma attack on February 3, 2005;

2. Medical records of Dr. Jaroslaw Pondo, dated July 26, 2005, through June 1, 2006, relative to Plaintiff's asthma;

3. Medical records from Mountain State Dermatology, dated July 14, 2005, and April 13, 2006, relative to Plaintiff's psoriasis;

4. Medical records from Davis Memorial Hospital, dated February 17, 2005, through July 1, 2005, which contained a pulmonary function test and x-rays; and

5. MRI's and x-rays, dated June 30 and July 1, 2005, relative to Plaintiff's bulging discs, stenosis, and degenerative disc changes (R. 269-70).

On September 30, 2004, Plaintiff's blood work results were normal (R. 293).

Plaintiff was treated by P.A. Barberio on July 14, 2005. P.A. Barberio noted Plaintiff medicated with Singulair, Advair, Albuterol, and hydrocodone. Plaintiff's general examination and appearance were normal. Plaintiff's ears, nose, throat, and extremities were normal upon examination. Plaintiff presented oriented times three, and her mood and affect were within normal limits. P.A. Barberio found Plaintiff was positive for joint pain and "large plaques of erythema." P. A. Barberio diagnosed psoriasis. She prescribed Dovanex, Clobetasol, and Cormax for treatment. Plaintiff was instructed to return in one to two months (R. 282, 283).

On February 3, 2005, Plaintiff presented to the emergency department of Davis Memorial

Hospital with complaints of "trouble breathing" and wheezing (R. 271). Plaintiff reported she medicated with Albuterol inhaler/nebulizer, Singulair, Advair, and Zoloft. It was noted on Plaintiff's Emergency Department patient record that she was to follow-up for treatment with Dr. Thompson the next day and that she was scheduled for a pulmonary function test the following week (R. 272). Examination of Plaintiff's HEENT, neck, cardiovascular, abdomen, skin, extremities, and neurologic and psychologic systems was normal. It was noted that Plaintiff was in no respiratory distress. She was positive for wheezing (R. 273). Plaintiff was treated with Albuterol and Atrovent. Plaintiff stated she was "'breathing much easier" before her discharge (R. 274).

On June 7, 2005, an x-ray was made of Plaintiff's lumbo-sacral spine at the direction of Dr. Thomspon. It showed normal stature and alignment of Plaintiff's vertebrae. No traumatic or destructive lesions were seen. Degenerative disc disease and narrowing at L5-S1 were observed, but "the other levels [were] well preserved." Minimal hypertrophic changes were present elsewhere and the S1 joints were unremarkable (R. 289).

Also on June 7, 2005, an x-ray was made of Plaintiff's cervical spine at the direction of Dr. Thompson. It showed normal stature and alignment of Plaintiff's vertebrae. No traumatic or destructive lesions were noted. Multilevel hypertrophic degenerative change, with small osteophytes throughout the mid, lower levels was observed. Plaintiff's disc spaces were generally well preserved and her prevertebral soft tissues were unremarkable. Except for the multilevel degenerative changes, the exam was negative (R. 290).

On June 30, 2005, a MRI was made of Plaintiff's lumbar spine at the direction of Dr. Thompson. It showed mild degenerative disc changes at the lower lumbar spine without significant stenosis. Plaintiff's alignment was normal; her bone marrow signal was normal; her spinal cord was

normal. Mild disc bulging was noted at L3-4, L4-5, and L5-S1 without significant central canal stenosis or neural foraminal narrowing (R. 288).

On June 30, 2005, a MRI was made of Plaintiff's cervical spine. It showed normal alignment, normal bone marrow signal, and normal spinal cord signal. A mild central, to slightly right, paracentral disc protrusion was seen at C3-4, with no significant stenosis. Mild to moderate central stenosis was seen at C4-5 at the site of a central disc herniation. There was no significant foraminal narrowing. No foraminal narrowing was found at C5-6; central disc herniation was suspected at this site. Mild central stenosis due to mild diffuse disc bulge was seen at C6-7 (R. 291).

On July 26, 2005, Plaintiff was examined by Dr. Pondo. Plaintiff was referred to him by Dr. Thompson. He found Plaintiff was positive for asthma. Dr. Pondo's examination of Plaintiff revealed normal neck, chest, cardiac, abdomen, extremity and neurologic systems. Dr. Pondo opined Plaintiff's "PFT's shows severe obstructive pattern with excellent response to bronchodilators." Dr. Pondo's assessment of Plaintiff was for asthma; he prescribed Advair, Flonase, and Prevacid. He discontinued Plaintiff's use of Atrovent. He ordered a chest x-ray and a pulmonary function test (R. 275).

On February 2, 2006, Plaintiff returned to Dr. Pondo for follow-up treatment for asthma. She had no chest pains; she had no hemoptysis. Dr. Pondo's examination of Plaintiff's neck, chest, cardiac, abdomen, extremity, and neurologic systems produced normal results. Dr. Pondo assessed asthma and instructed Plaintiff to increase treatment with Advair. Dr. Pondo told Plaintiff to continue nasal spray and other medications (R. 276).

On March 16, 2006, Plaintiff kept her follow-up appointment with Dr. Pondo. He found

Plaintiff's neck, chest, cardiac, abdomen, extremity, and nuero cranial nerves examinations were normal. He assessed asthma and instructed Plaintiff to continue treatment with Advair and "continue other medications." Plaintiff was also instructed to repeat "spirometry in two months" (R. 277).

On what appears to be April 13, 2006, Plaintiff reported to Dr. Jackson for treatment of psoriasis. Plaintiff reported her condition was the "same." She was medicated with Dovonex, Clobetasol, and Cormax. Dr. Jackson noted Plaintiff was positive for arthritis in her hips, fingers, toes, and shoulder. He discussed Enbrel injections with her. He diagnosed psoriasis (R. 284).

On April 26, 2006, Plaintiff was again examined at Franz Dematology and Associates, Inc., to have her right post arm examined relative to a "grey color mole." Plaintiff's examination was within normal limits; she was oriented times three; her mood and affect were normal (R. 285).

Spirometry report, dated June 1, 2006, showed Plaintiff's FEV1 at 57% and her PVC at 68%. The interpretation was for "[m]oderately severe obstruction, with low vital capacity" (R. 279, 286).

On June 1, 2006, Plaintiff presented to Dr. Pondo for follow-up treatment of her asthma. Dr. Pondo noted Plaintiff's "repeat spirometry" test of that date "showed FEV1 of 57% of predicted. FEC 68% of predicted (R. 278, 279). This is an improvement." Plaintiff's neck, chest, cardiac, abdomen, extremity, and neuro cranial nerves were all normal. Dr. Pondo diagnosed asthma and hypertension. He instructed Plaintiff to continue treating her asthma with Advair and increase her activity by walking (R. 278).

Plaintiff, on March 23, 2007, requested the Appeals Council admit the evidence to the record and remand the case "for full and proper consideration of the evidence" (R. 270). On June 27, 2007, the Appeals Council noted receipt of the above documents of evidence and, after review of same and review of the record, found no reasons to review the ALJ's decision (R. 5-8).

18

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Norma Cannon made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: asthma, chronic obstructive pulmonary disease (COPD), chronic back pain, psoriasis, depressive disorders and anxiety disorders. (20 CFR 404.1520(c)). There was no medical evidence to supports [sic] a significant work-related impairment from the claimant's reported history of hypoglycemia, migraines [sic] headaches, colitis, and hypertension.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The claimant's asthma and COPD did not satisfy the severity criteria for listings 3.02 and/or 3.03, as documented by the PFT discussed above. The claimant [sic] low back pain did not have either radiographic or clinical evidence to satisfy the requirement of listing 1.04. The claimant's psoriasis did not satisfy the severity criteria under listing 8.04. There was no medical evidence to support any [sic] a significant work-related impairment from the claimant's reported history of hypoglycemia, migraines [sic] headaches, colitis, hypertension or obesity. Ms. Littlefield's Affective Disorders and Anxiety Disorders, evaluated under listings 12.04 and 12.06 respectively, satisfied the "A" criteria but not the "B" severity criteria. In the areas of the "B" functional domain criteria, the claimant's limitations in both her activities of daily living and social functioning were 'mild' [sic]; 'moderate' [sic] in concentration, persistence, or pace; and 'none' [sic] in episodes of decompensation. There was no medical evidence to establish the presence of the "C" criteria. (20 CFR 404.1520(c)). These findings are consistent with the residual functional (RFC) assessment more fully discussed below.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a wide range of light physical exertional work-related activities with a sit/stand option and occasional postural movements. The work must not require climbing of

ropes, ladders, or scaffolds and cannot expose the claimant to hazards such as unprotected heights or dangerous and moving machinery. She must not be exposed to extreme temperatures, wetness, humidity, dust, fumes, odors, or gases. The claimant can perform entry level, unskilled routine/repetitive work tasks of simple instructions in a low stress work setting. The work must be with things rather than people and she must have infrequent contact with the public and co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 30, 1963 and was 39 years old on the alleged disability onset date, which is defined as a younger individual. (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability due to the claimant's RFC. (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from October 1, 2003 through the date of this decision (20 CFR 404.1520(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred in not fulfilling her duty to develop the record as required by the Regulations and Fourth Circuit case law when she failed to obtain the records and medical tests from treating physicians.

    A. The ALJ in this matter clearly failed to develop material evidence.

    B. The ALJ's failure to develop the record prejudiced Plaintiff's claim because the ALJ relied heavily on objective medical evidence, and there lack thereof, in her decision.

The Commissioner contends:

1. The ALJ fulfilled her duty to develop the record.

## C. RECORD OF EVIDENCE

Plaintiff contends the ALJ erred by not fully developing the record because she failed to obtain the records of Plaintiff' treating specialists and various medical tests. The Commissioner contends the ALJ fulfilled her duty to develop the record.

The Fourth Circuit, in *Cook v. Heckler*, 783 F.2d 1168, 1173 (1986), held that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." (*Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). Additionally, the *Marsh* Court held that "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." (*Cutler v. Weinberger*, 516 F.2d 1282 (2nd Cir. 1975); *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3rd Cir. 1974); *Hicks v. Mathews*, 424 F.Supp. 8 (D.Md. 1976)). *Marsh, supra* at 300.

In the instant case, Plaintiff alleges the ALJ failed to obtain the following evidence for the record: February 3, 2005, emergency room visit at Davis Memorial Hospital; Dr. Pondo's treatment notes from July 26, 2005, through June 1, 2006, which included a spirometry test; medical records from Dr. Franz and other doctors in his dermatology practice, dated between July 14, 2005, and April 13, 2006; June 7, 2005, lumbo-sacral spine and cervical spine x-rays; and June 30, 2005, lumbar and cervical spine MRI's. Plaintiff argues that the ALJ should have known that these records were not included in the record (Plaintiff's brief at p. 10). Plaintiff is correct.

When questioned at the administrative hearing about the treatment she received for asthma and psoriasis, Plaintiff stated that she was treated for psoriasis by Dr. Franz or his partner, Dr.

Jackson, every three months, and she had been treated by Dr. Pondo, a pulmonologist, every three months or as needed (R. 314). Additionally, the record of evidence did contain a July 15, 2005, Disability Report – Appeal, completed by Plaintiff and available for consideration and review by the ALJ prior to her rendering her decision. In that report, Plaintiff noted she had been treated for psoriasis by Dr. Franz, starting July 14, 2005; had had cervical and lumbar x-rays made on June 7, 2005; had had cervical and lumbar MRI's made on June 30, 2005; and was beginning treatment with Dr. Pondo on July 22, 2005, for asthma (R. 167, 166, 170). In addition to the Plaintiff noting her treatment by Dr. Franz and his associate, Dr. Thompson noted, in her April 24, 2006, office note, that Plaintiff had an appointment with Dr. Jackson on April 26, 2006 (R. 262). The ALJ had information available to her at the time of her decision that these records existed and that the evidence submitted by the Plaintiff was inadequate in that it was not complete. She then had the duty to fully inquire into the issues necessary for adequate development of the record and obtain those records so that she could base her decision on the complete record of evidence.

There are three records from Dr. Franz's dermatology practice that were contained in the evidence that was before the ALJ at the time of her decision. There is a July 14, 2005, letter to Dr. Thompson from Physician Assistant Barberio about her planned treatment of Plaintiff for psoriasis. This letter also informed Dr. Thompson that Plaintiff would be treated every one to two months by the Franz dermatology group. There is a July 14, 2005, treatment note from P.A. Barberio, which contained a diagnosis of psoriasis and a finding that Plaintiff had joint pain (R. 24, 267-68). There is also an April 26, 2006, office record relative to a biopsy of the right posterior arm (R. 24, 266, 267). After a review of the record before her, the ALJ noted "[t]here was no other medical treatment reports from Dr. Franz . . . to indicate that the claimant's psoriasis was significant enough to

23

preclude all work-related activities" (R. 24). If the record had been complete, it would have included "other medical treatment reports" from April 13, 2006, and April 26, 2006, by Dr. Jackson (R. 282-85).[1] On April 13, 2006, Dr. Jackson, a dermatologist who practiced with Dr. Franz, diagnosed psoriasis and found Plaintiff was positive for arthritis in her hips, fingers, toes, and shoulder. He discussed Enbrel injections with Plaintiff (R. 284). On April 26, 2006, Plaintiff was again examined by a physician at Dr. Franz's dermatology group. Because these records were not before the ALJ, she did not consider or analyze Dr. Jackson's diagnosis of arthritis, which expands on the diagnosis of joint pain that P.A. Barberio made on July 14, 2005.

As of the date of the administrative hearing, the record of evidence contained no treatment notes from Dr. Pondo. Dr. Pondo began treating Plaintiff on July 26, 2005. On that date, Dr. Pondo diagnosed asthma (R. 275). On February 2, 2006, Dr. Pondo again diagnosed asthma and increased Plaintiff's dose of Advair (R. 276). Plaintiff was examined by Dr. Pondo on March 16, 2006, on which date he ordered a spirometry examination. He diagnosed asthma (R. 277). These records are relevant to Plaintiff's alleged asthma condition.

The existence of the records of Drs. Franz and Pondo were made known to the ALJ by the Plaintiff, both at the administrative hearing and in her Disability Report – Appeal.[2] Dr. Thompson also noted Plaintiff's treatment by Dr. Jackson (R. 262). The ALJ had a duty to fully develop the

---

[1] Plaintiff contends that the July 14, 2005, treatment note of P.A. Barberio was not included in the original record of evidence (R. 282, 283). The Plaintiff is incorrect. It appears, in conjunction with the July 14, 2005, letter from P.A. Barberio to Dr. Thompson (R. 267-68). (Exhibit 10F).

[2] Dr. Pondo's examination of Plaintiff on June 1, 2006, and the spirometry report, dated that same day, did not exist prior to the administrative hearing as the examination and test occurred after the May, 2006, hearing date. They did exist prior to the issued decision.

record by obtaining these documents.

In addition to records by specialists for treatment of psoriasis (with arthritis) and asthma, Plaintiff had undergone medical testing, the results of which were not in the record at the time the ALJ made her decision. On June 7, 2005, Plaintiff had lumbo-sacral spine and a cervical spine x-rays made. The lumbo-sacral x-ray showed degenerative disc disease and narrowing at L5-S1. There were minimal hypertrophic changes present (R. 289). The record contained a November 10, 2004, x-ray of Plaintiff's lumbar spine, which showed marked narrowing of L5-S1 (R. 206). The record, however, did not contain any previous cervical spine x-ray for review and consideration by the ALJ. The June 7, 2005, cervical spine x-ray showed multilevel hypertrophic degenerative change, with small osteophytes throughout the mid, lower levels (R. 290). Additionally, on June 30, 2005, Plaintiff had a MRI of her lumbar spine and a MRI of her cervical spine completed. The record of evidence contained no previous MRI test reports. The June 30, 2005 lumbar MRI showed mild degenerative disc changes at the lower lumbar spine, without significant stenosis. It revealed mild disc bulging at L3-4, L4-5 and L5-S1 (R. 288). The June 30, 2005, cervical MRI showed a mild central, to slightly right, paracentral disc protrusion at C3-4; mild to moderate central stenosis at C4-5, which was at the site of the central disc herniation; and a "suspected" disc herniation at C5-6 (R. 291). Although the Plaintiff did not inform the ALJ at the administrative hearing that these tests had been completed, she did so indicate their existence on her Disability Report – Appeal. Plaintiff noted that she had x-rays made of her "neck" and lower lumbar spine on June 7, 2005, at Davis Memorial Hospital and MRI's of her "neck" and lower lumbar spine on June 30, 2005, at Davis Memorial Hospital (R. 167). In addition to the Plaintiff's listing these tests on the Disability Report – Appeal, Dr. Thompson noted both sets of tests on her office treatment notes, dated July 7, 2005

(R. 265). Based on the references of the existence of these tests within the record that was before the ALJ, the ALJ had a duty to obtain and consider them.

Plaintiff also contends the ALJ erred in that she did not develop the record by obtaining the February 3, 2005, record of Plaintiff's emergency room visit. A review of the record that was before the ALJ at the time of her decision reveals that there is no reference in the record to the February 3, 2005 emergency room visit; therefore, the ALJ had no way of knowing of the existence of such record and had no duty to obtain and consider same.

It must be noted that Plaintiff was represented at the administrative hearing by counsel. The following exchange, relative to the record, took place between Plaintiff's counsel and the ALJ:

ALJ:    Mr. Berry, have you had an opportunity to look over the exhibits in the file in this case?

Berry:  Actually, Your Honor, we did not. The file was to be transmitted to Atlanta for copying, I don't think it ever made it, but I have submitted the exhibit list and I'm, I'm content with my preparation and going forward.

ALJ:    All right. If you have no objections then I will admit the exhibits that are contained in the file. If there are any objections that come up once you peruse the file, you can always let me know about that(R. 298).

Plaintiff's counsel, Mr. Berry, did not supplement the record with MRI's, x-rays, office notes of Drs. Pondo and Jackson, results of the spirometry test, or notes from the hospital for Plaintiff's emergency visit. This evidence that was submitted to the Appeals Council by the lawyer who represented Plaintiff after the ALJ's decision was rendered. Mr. Berry's response to the ALJ's questioning about the record and his review of it confirmed that he had reviewed the exhibit list and was ready to proceed. Based on this exchange with Plaintiff's counsel, it would be reasonable for the ALJ to accept the record before her as complete; however the information provided to the ALJ

about Plaintiff's treatment by specialists and the various medical tests through the testimony of Plaintiff and through a thorough review of the record before her is sufficient to have caused the ALJ to question the completeness of the record and to then obtain additional evidence.

The undersigned finds that the ALJ erred in not fully developing the record to include the treatment notes of Plaintiff's pulmonary and dermatological specialists and results of medical tests. The undersigned, therefore, finds the ALJ's decision is not supported by substantial evidence.

Plaintiff next contends that the Appeals Council erred by "summarily conclud[ing] that the new evidence did not provide a basis for changing the ALJ's decision without explanation of the weight it afforded that new evidence" (Plaintiff's brief at p. 14).

Pursuant to 20 CFR §404.970(b), the Appeals Council shall consider evidence submitted with a request for review of the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991. Evidence is not "new" if other evidence specifically addresses the issue. *See Id.* at 96.

The undersigned finds the evidence that was submitted to the Appeals Council was new. The record contained no other MRI tests and no previous cervical spine x-ray. The record did not contain any treatment notes from a pulmonologist. The information contained in Dr. Jackson's treatment notes as to Plaintiff's arthritis was not found in any other doctor's treatment notes. There is no previous record of Plaintiff presenting to a hospital's emergency department for treatment of asthma. The evidence relates to the period on or before the dates of the ALJ's decision. The medical records and treatment notes are dated during the time prior to the ALJ's decision and relevant as each is

connected to a condition of which Plaintiff complained. Finally, the evidence is material because if this evidence had been before the ALJ at the time of the administrative hearing and at the time she rendered her decision, it could have altered her decision. The undersigned is not finding here that the ALJ's decision that Plaintiff was not disabled could have been altered had she considered the new, relative, and material evidence. The undersigned does opine that the ALJ's decision could have been altered in that these medical tests and diagnosis, especially as to the diagnosis of arthritis, would have been weighed and considered in combination with the other evidence before the Commissioner.

The undersigned must next review the new evidence. In *Ridings v. Apfel*, 76 F. Supp. 2d 707 (W.D.Va. 1999), the district judge held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. The district judge in the *Ridings* case expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence and cited, as a basis for this decision, *Hollar v. Commissioner of Social Security*, 194 F.3d 1304 (4th Cir. 1999)(unpublished).

Despite holding that the Appeals Council was not required to articulate its reasoning for denying review, the district judge affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, <u>when reviewed along with [the new evidence]</u>." *See Ridings*, *supra* at 709 (emphasis added). In other words, the Court must consider the new evidence together with the evidence before the ALJ to determine whether the ALJ's decision was supported by substantial evidence. *See Wilkins*, *supra* at 93 (4th Cir. 1991), which mandates:

Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." The Appeals Council specifically incorporated [the new evidence] into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether evidence supports the Secretary's findings.

*Id.* at 93.

The undersigned must, therefore, review the record as a whole, including the record of Plaintiff's emergency room visit, the treatment notes of Drs. Pondo and Jackson, the results of the spirometry test, and the results of the MRI's and x-rays.

Plaintiff was treated at the Davis Memorial Hospital emergency department on February 3, 2005, for difficulty breathing and wheezing (R. 271). She was treated with Albuterol and Atrovent (R. 274). In her decision, the ALJ found that Plaintiff had never gone to the hospital for treatment of asthma (R. 27). That finding is not supported by substantial evidence.

Dr. Pondo, Plaintiff's treating pulmonologist, diagnosed Plaintiff with asthma. He treated her for that condition from July 26, 2005, through June 1, 2006 (R. 275, 278). On June 1, 2006, at the direction of Dr. Pondo, Plaintiff underwent a pulmonary function test, which showed moderately severe obstruction with low vital capacity (R. 279, 286). As to Plaintiff's asthma, the ALJ noted Plaintiff's "chief physical complaints were her asthma" (R. 24) and that Plaintiff claimed that she could not perform her work at her printing company "mostly because of breathing" (R. 25). The ALJ found Plaintiff did not have trouble breathing at the administrative hearing and she did not accept "medical findings or opinions that are based solely or primarily on the claimant's subjective complaints" (R. 27). Plaintiff's breathing condition was treated by a specialist, who opined she had asthma. A pulmonary function test confirmed the condition. The ALJ's finding, therefore, is not supported by substantial evidence.

Dr. Jackson, a dermatological associate of Dr. Franz, treated Plaintiff for psoriasis. On April 13, 2006, Dr. Jackson diagnosed Plaintiff with arthritis in her hips, fingers, toes, and shoulder and he discussed Enbrel injections with her for treatment of her arthritis. This diagnosis is in contrast to Dr. Beard's November 14, 2004, diagnosis of "no appreciable psoriatic arthritis" (R. 203). The diagnosis of arthritis was not considered or evaluated, so no determination as to its being severe or medically determinable was made. Substantial evidence does not support the Commissioner's finding that Plaintiff's psoriasis was not significant (R. 24).

The same finding can be made as to the cervical x-ray taken on June 7, 2005. It showed multilevel hypertrophic degenerative changes, with small osteophytes throughout the mid and lower levels of Plaintiff's cervical spine. In addition to the cervical x-ray, Plaintiff had a lumbar MRI made on June 30, 2005. It showed mild degenerative disc changes at the lower lumbar spine, mild disc bulging at L3-4, L4-5, and L5-S1. The June 30, 2005, MRI of Plaintiff's cervical spine showed a slight right, paracentral disc protrusion at C3-4, mild to moderate central stenosis at C4-5 at the site of a central disc herniation, and suspected central disc herniation at C5-6 (R. 291). These medical tests were not weighed or considered. They were not analyzed relative to Plaintiff's complaints of neck and low back pain, and they were not evaluated in combination with Plaintiff's other complaints or conditions. The ALJ's decision that she did "not believe additional medical evidence received after Dr. Beard's detailed physical examination on November 14, 2004 and the State Agency's PRFT dated June 1, 2005 made any material change to the claimant's overall physical conditions" is not supported by substantial evidence (R. 24).

The undersigned, therefore, finds that the decision of the Appeals Council as to the new evidence, in the form Plaintiff's emergency room visit, the treatment notes of Drs. Pondo and

Jackson, the results of the spirometry test, and the results of the MRI's and x-rays, is not supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for appropriate consideration of the new, relative and material evidence. This remand is only necessary because Plaintiff's administrative hearing council failed to confirm that all relevant exhibits were contained in the record that was before the ALJ. If the above discussed evidence had been before the ALJ prior to her rendering her decision, perhaps that decision - whether in favor of the Plaintiff or against Plaintiff – would not have been challenged.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 15 day of October, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE